2010 VT 86

## State of Vermont v. Carl Devoid, Jr.

[8 A.3d 1076]

No. 09-208

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed September 17, 2010

446

*Ross A. Feldmann* of *Gravel and Shea*, Special Deputy State's Attorney, and *Thomas J. Donovan, Jr.*, Chittenden County State's Attorney, Burlington, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant Carl Devoid, Jr. appeals his jury conviction for attempted voyeurism, a crime that the State did not originally charge, but that the court instructed the jury could find was committed. Among other arguments, defendant contends that the evidence at trial does not support the conviction. We agree and reverse.

¶ 2. Complainant resides on the second floor of an apartment building located in a secluded area in Colchester, Vermont. There is a window in her bathroom shower that overlooks a parking lot used by residents of the building. The bottom of the window is at the level of complainant's mid-chest. When complainant moved in, her landlord suggested that she cover the window with a shower curtain to protect the window from water damage. Complainant, however, did not do so. She did not think anyone could see her through the window.

¶ 3. Defendant is complainant's neighbor who resides on the first floor. He can hear complainant's shower turn on and off from his apartment. On September 1, 2008, complainant saw defendant for a few moments while he stood in the parking lot looking at her bathroom window as she was showering. On September 15, 2008, complainant again saw defendant standing in the parking lot looking at her bathroom window while she was in the shower. This

time, defendant stared at her window for three minutes with a hand on his crotch. Complainant left the shower, went into her bedroom and took a picture of defendant — still looking up with a hand on his crotch — with her cell phone.

¶ 4. Later that day, complainant asked her roommate — who is the same height as complainant — to stand in her shower. Meanwhile, complainant went to the parking lot and looked up at her bathroom window to determine whether anyone could see her from the ground. The parties disagree on what complainant saw when she looked up at her window and whether defendant could see any part of complainant's body that is protected by the voyeurism statute.

¶ 5. On September 16, 2008, complainant reported the incident, and the State charged defendant with voyeurism "by viewing [complainant] . . . through a window while she was showering in the privacy of her home" in violation of 13 V.S.A. § 2605(b)(1). The statute provides in relevant part that "[n]o person shall intentionally view . . . the intimate areas of another person without that person's knowledge and consent while the person being viewed . . . is in a place where he or she would have a reasonable expectation of privacy." 13 V.S.A. § 2605(b)(1). The statute further defines "view" as "the intentional looking upon another person for more than a brief period of time, in other than a casual or cursory manner," and states that the term "intimate areas" includes a "female breast," which is defined as "any portion of the female breast below the top of the areola." *Id.* § 2605(a)(2), (4), (7).

¶ 6. The case went to trial, and defense counsel moved for judgment of acquittal, arguing that the evidence was insufficient to conclude either that defendant intended to view the intimate areas of complainant's body or that defendant did view those areas. The court denied the motion and submitted the case to the jury. During deliberations, the jury sent a note to the judge that read: "If we think that he is guilty of trying; but was not able to see her nipples. What kind of verdict do we give? We have not proven that he saw anything. But we believe he was trying." In response, the judge, over defendant's objection, issued the following supplemental instruction on attempt:

> Under Vermont law, a person who attempts to commit an
> offense and does an act toward the commission thereof,
> but by reason of being interrupted or prevented in the

execution of the same, may be found guilty of the offense charged if the jury finds, beyond a reasonable doubt, that the attempt to commit the offense was made.

¶ 7. The jury then asked the judge to clarify whether "by reason of being interrupted or prevented in the execution of the same" could mean a physical block, such as a windowsill, rather than an occurrence whereby someone physically prevented commission of the act. The judge did not give a direct answer, but instead cited a case that discusses the elements of attempt. The jury returned a verdict finding defendant guilty of attempted voyeurism. Defendant renewed his motion for judgment of acquittal, arguing that the evidence presented at trial was insufficient for a conviction of attempted voyeurism, and that the supplemental instructions were prejudicial to him. The court denied defendant's motion. The court held that the evidence that defendant looked up at complainant's window for three minutes while holding his crotch was sufficient to support a conviction for attempted voyeurism, and that the timing of the supplemental instructions was not prejudicial to defendant. This appeal followed.

¶ 8. On appeal, defendant argues that the trial court erred by giving supplemental instructions to the jury, by denying defendant's motion for acquittal, and by admitting evidence of a prior bad act — defendant's first alleged viewing of complainant. We first consider whether the evidence was sufficient to support the attempted voyeurism conviction. We hold that the evidence was insufficient and, therefore, reverse the conviction without reaching the other appeal issues.

¶ 9. When reviewing a denial of motion for judgment of acquittal, we view the evidence "in the light most favorable to the prosecution, . . . and determine whether the State's evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." *State v. Lemay*, 2006 VT 76, ¶ 11, 180 Vt. 133, 908 A.2d 430 (quotation omitted). Defendant claims he was entitled to judgment of acquittal because the State provided no evidence from which the jury could reasonably conclude that: (1) he intended to view complainant's intimate areas; (2) his actions constituted an overt act of attempt; (3) he was interrupted or prevented from committing the act, other than by physical impossibility; and (4) complainant had a reasonable expectation of privacy. Specifically, defendant argues that given the impossibility of his being able to see complainant's intimate areas from his

vantage point on the ground, his act of merely looking at her window did not constitute an attempt. We agree that the evidence, taken in the light most favorable to the State, fails to support the charge of attempted voyeurism.

¶ 10. Vermont's attempt statute provides that "[a] person who attempts to commit an offense and does an act toward the commission thereof, but by reason of being interrupted or prevented fails in the execution of the same, shall be punished as herein provided." 13 V.S.A. § 9(a). As we have previously held, two elements[1] required for attempt are: (1) intent to commit a certain crime; and (2) " 'an overt act designed to carry out that intent.' " *State v. Synnott*, 2005 VT 19, ¶ 22, 178 Vt. 66, 872 A.2d 874 (quoting *State v. McGee*, 163 Vt. 162, 165, 655 A.2d 729, 732 (1995)).

¶ 11. An overt act must advance beyond mere intent and "reach far enough toward accomplishing the desired result to amount to the commencement of the consummation." *Id.* (quotation omitted). Preparation counts as an act if it "would be likely to end, if not extraneously interrupted, in the consummation of the crime intended." *State v. Hurley*, 79 Vt. 28, 31, 64 A. 78, 78 (1906). Once an actor commits an overt act, "the offense is

---

[1] Defendant argues that there is a third element in the statutory language, that defendant failed in the execution of the crime "by reason of being interrupted or prevented." As we quote in the text, the decision in *State v. Hurley* distinguishes preparation for a crime from an attempt to commit a crime, stating that the preparation "must be such as would be likely to end, *if not extraneously interrupted*, in the consummation of the crime intended." 79 Vt. 28, 31, 64 A. 78, 78 (1906) (emphasis added). This quotation suggests that extraneous interruption or prevention is a prerequisite for the offense. In *State v. Curtis*, we considered this language in a case where defendant was convicted of attempting to kill a deer out of season when he shot at a wooden deer decoy. 157 Vt. 629, 603 A.2d 356 (1991). We held that defendant was " 'prevented' from shooting a wild deer because he was tricked into shooting a decoy." *Id.* at 632, 603 A.2d at 358.

Despite these discussions of interruption and prevention, we ruled in *State v. Brown*, 153 Vt. 263, 272, 571 A.2d 643, 648 (1989), that failure to include an allegation of interruption or prevention in the information was not fatal to the charge. We noted in a footnote that the Wisconsin Supreme Court had ruled that similar language in its statute did not add an element to the crime of attempt. *Id.* (citing *Berry v. State*, 280 N.W.2d 204, 209 (Wis. 1979)).

Because of our disposition, we do not examine whether the language contains an additional element or, if so, how it would apply in this case.

complete, and abandonment of the enterprise does not negate guilt." *Synnott*, 2005 VT 19, ¶ 22.

¶ 12. Here, the alleged overt act committed by defendant is standing on the ground, staring at complainant's second-floor bathroom window for three minutes with a hand on his crotch. The key point of disagreement is whether defendant was able to see complainant's intimate areas, as defined by the voyeurism statute, from his location on the ground. The State asserts that defendant could and did; defendant contends that he could not. Based on our review of the jury's conclusions and the evidence, we agree with defendant.

¶ 13. At trial, complainant agreed, in response to the prosecutor's question, that the bottom of the window was at her "mid-chest area," without specifying whether the intimate areas protected by the voyeurism statute were lower or higher than the windowsill. She also testified that she observed her roommate at the window from defendant's vantage point, but the prosecution did not ask whether she could see an intimate area of her roommate's body as defined by the voyeurism statute. Other evidence on this issue includes a picture taken from inside of complainant's bathroom that shows complainant standing in front of her bathroom window. This picture clearly demonstrates that intimate areas of complainant are lower than the windowsill. We must conclude from this evidence that the jury could not find that defendant could see intimate areas of complainant's body, as defined by the statute, particularly given that complainant's shower was located on the second floor and defendant was looking at her bathroom window from the ground. Obviously, the jury agreed. The jury's notes to the judge indicate that the jurors concluded that the State had failed to prove that defendant was able to see an intimate area of complainant's body from his vantage point. Thus, even when viewed most favorably to the State, the evidence reveals that the window was too high to allow defendant to see any intimate areas of complainant's body.

¶ 14. The critical question before us, then, is whether, given defendant's inability to see complainant's intimate areas, the jurors could still find him guilty of attempted voyeurism. We hold that they could not, as his actions did not constitute an overt act of attempted voyeurism and the State could not prove the requisite intent.

¶ 15. An overt act of attempted voyeurism requires an action that "would be likely to end" in acquiring a view of complainant's intimate areas. See *Hurley*, 79 Vt. at 31, 64 A. at 78. Here, because defendant was unable to see complainant's intimate areas from his position on the ground, his actions of standing and looking would *not* be likely to end "in the consummation of the crime intended." See *id.* Had he attempted to elevate himself from the ground to a position from which he would be able to gain a view of complainant's intimate areas, this case would be different. The act of merely looking at complainant's window from a place where no view of her intimate areas was possible, however, is insufficient for the jury to find defendant guilty of attempted voyeurism. Cf. *State v. Boutin*, 133 Vt. 531, 533, 346 A.2d 531, 532 (1975) (noting that "the holding of a bottle in one hand ten feet from the intended victim does not make it likely to end in the consummation" of an assault); *State v. Woodmansee*, 124 Vt. 387, 391, 205 A.2d 407, 410 (1964) (holding that attempt to commit arson took place where defendant was "kneeling in the middle of the kitchen floor, matches in hand, together with a cone-shaped roll of newspaper, with a jar of paint thinner beside him and in the presence of a strong odor of gasoline," and where "the striking of a match would have . . . consummated the crime"); *Hurley*, 79 Vt. at 33, 64 A. at 79 (holding that procurement of tools for jail breaking did not constitute an overt act of an attempt to break jail).

¶ 16. The State's theory in this case is that defendant's looking at the window is a sufficient overt act. There are significant difficulties with this theory. Under it, any looking in the direction of a person known to be naked is an overt act even if the person were fully behind a wall. Because defendant could not see the intimate areas of complainant's body and must have been aware of that circumstance, we cannot distinguish between desire to view those intimate areas and intent to do so. Thus, the alleged overt act is not corroborative of defendant's criminal purpose. See Model Penal Code § 5.01(2) (for conduct to be a "substantial step" to commission of the crime, the conduct must be "strongly corroborative of the actor's criminal purpose.").

¶ 17. For related reasons, we do not believe that the State has provided sufficient evidence of defendant's intent to view complainant's intimate areas as required for a criminal attempt.

Defendant apparently obtains sexual gratification from watching the upper body of a woman he believes is naked, and we can infer from that fact that he would like to see her naked. We cannot infer from the facts in the record, however, that he had the intent to commit voyeurism or would have committed that crime. As Professor LaFave notes in discussing the interrelationship between impossibility and intent, "a defendant's declared intent to kill another person may be put in doubt if he only attacks with a small switch." 2 W. LaFave, Substantive Criminal Law § 11.5, at *2 (2009).

¶ 18. Defendant has argued that commission of the crime of voyeurism was impossible, and we should hold that impossibility is a complete defense to the intent crime. This argument is superficially attractive because the facts demonstrate that it was impossible for defendant to view complainant's intimate areas. In *State v. Curtis*, however, we considered and rejected the availability of an impossibility defense in a case where defendant shot at a deer decoy, believing it was a deer, and was charged with attempt to shoot a live deer out of season. 157 Vt. 629, 603 A.2d 356 (1991). We noted that defendant's behavior demonstrated the intent to shoot a deer out of season and that he performed an overt act towards commission of the crime. *Id.* at 631, 603 A.2d at 358. We concluded that "[h]is conduct went as far as it could in achieving the goal of taking a wild deer out of season." *Id.* In holding that defendant could be convicted of attempt even though it was impossible for him to kill a live deer by his action, we held that he had been "prevented" from shooting a live deer only by the trick of the game warden and the situation was indistinguishable from one in which a live deer was made a decoy but protected from being killed. *Id.* at 632, 603 A.2d at 358. We added that the trend in the states, and in the Model Penal Code, was to eliminate impossibility as a defense to an attempt. *Id.* at 632-33, 603 A.2d at 358-59. We also added that defendant's conduct was unequivocal and did not evidence an intent "to do both a legal and an illegal act." *Id.* at 634, 603 A.2d at 359.

¶ 19. As *Curtis* states, the modern trend has been to eliminate impossibility as a defense in attempt cases. Thus, it is important to distinguish *Curtis* and attempt cases involving impossibility generally. Like virtually all attempt cases where impossibility is raised as a defense, *Curtis* involved a defendant who was trying to commit a completed crime but was mistaken about

law or fact such that the defendant could not commit the crime. See 1 A.L.I., Model Penal Code and Commentaries § 5.01 cmt. 3, at 307 (1985) (Code addresses impossibility by measuring defendant's conduct "according to the circumstances as he believes them to be, rather than the circumstances as they may have existed in fact."); J. Hasnas, *Once More Unto the Breach: The Inherent Liberalism of the Criminal Law and Liability for Attempting the Impossible*, 54 Hastings L.J. 1, 1-3 (2002) (using mistake hypotheticals to explain the impossibility defense); P. Westen, *Impossibility Attempts: A Speculative Thesis*, 5 Ohio St. J. Crim. L. 523, 528 (2008) (A criminal undertaking fails because of impossibility when "though the actor would be committing a crime if he did everything he intends under the conditions that he believes exist at the time, what he actually does — or what he would do if he fully acted on his intent — is not the offense he intends to commit, because the conditions are not what he believes them to be."). In *Curtis*, defendant was mistaken in his belief that his target was a live deer, but his intent to commit a crime was clear. Here, there was no mistake; defendant necessarily knew that he could not complete the crime, and thus his conduct was equivocal. As a result, this case lacks the criminal culpability apparent in *Curtis*.[2] Despite the superficial similarity, this is not an impossibility case like *Curtis*; the rejection of impossibility as a defense in *Curtis* does not affect our analysis here.

¶ 20. We hold that in this case the evidence presented did not "sufficiently and fairly" support a verdict of guilt of attempt to commit voyeurism. For that reason, the motion for judgment of acquittal should have been granted.

*Reversed.*

¶ 21. **Skoglund, J.,** concurring. I agree with the majority's conclusion that the evidence adduced at trial could not support the attempted voyeurism charge. And I certainly agree with the jury's

---

[2] *Curtis* notes that the Model Penal Code rejected the impossibility defense to an attempt, suggesting that the defendant in *Curtis* would have been guilty under the Model Penal Code definition. 157 Vt. at 633-34, 603 A.2d at 359. Here, we note the opposite. Despite the Model Penal Code's rejection of an impossibility defense, defendant in this case would not be guilty under the Code's definition of the crime of attempt, see Model Penal Code § 5.01(1)(a)-(c), primarily because there is no difference between the circumstances as defendant believes them to be and the circumstances in fact, see A.L.I., *supra*, cmt. 3, at 307.

apparent-but-unannounced decision that the evidence at trial did not support the original charge of voyeurism. I write this addendum because in my view the trial court's decision to instruct the jury on a new charge — after they had begun to deliberate — was error, serious error that deprived defendant of his constitutionally protected right to a fair trial.

¶ 22. As the majority notes, defendant was only ever charged with voyeurism. The charge of attempted voyeurism, upon which he was ultimately convicted, came about only after the jury had begun deliberating on the charge of voyeurism and appeared to conclude that defendant was not guilty of the charged crime, sending the judge a note asking, "If we think he is guilty of trying; but was not able to see her nipples. What kind of verdict do we give? We have not proven that he saw anything." In his initial instructions to the jury, the judge had told them repeatedly that "if the state has not met its burden [of proving each and every element of an offense], then you must return a verdict of not guilty for the offense." Why the judge did not simply repeat that basic principle of criminal law in response to the jury's question remains a mystery to me. Rather, the court responded by providing the jury with an alternative theory of the case and instructed the jury on the crime of attempt.[3] Neither the prosecution nor the defense had suggested this additional charge; defense counsel, in fact, strongly objected to it, arguing that such a charge would be highly prejudicial and highlighting that she had not prepared for the new charge and would have changed her closing argument had she known such an instruction would be given.

¶ 23. We have generally recognized that the "necessity, extent and character of supplementary instructions requested by a jury" are within the sound discretion of the trial court. *State v. West*, 151 Vt. 140, 142, 557 A.2d 873, 875 (1988). As such, we will reverse only when an abuse of discretion by the court results in prejudice to the defendant. *Id.* at 143, 557 A.2d at 875; see *State v. Day*, 150

---

[3] The judge's instruction was the statutory definition of attempt from 13 V.S.A. § 9:

Under Vermont law, a person who attempts to commit an offense and does an act toward the commission thereof, but by reason of being interrupted or prevented in the execution of the same, may be found guilty of the offense charged if the jury finds, beyond a reasonable doubt, that the attempt to commit the offense was made.

Vt. 119, 125, 549 A.2d 1061, 1065 (1988) ("[I]mproper jury instructions are grounds for reversal only when prejudice is shown; the burden of proof on the issue of prejudice is on the party alleging the error."). We find such an abuse of discretion "only upon a showing that the court failed to exercise its discretion, or that it exercised discretion for clearly untenable reasons, or to an extent that is clearly unreasonable." *West*, 151 Vt. at 143, 557 A.2d at 875. I believe the trial judge's exercise of discretion in this case cannot be sustained.

¶ 24. The bulk of our jurisprudence on supplementary jury instructions involves cases where the later instruction addressed a question about the trial or clarified an element of the existing charge. See, e.g., *State v. Rideout*, 2007 VT 59A, ¶¶ 13-14, 182 Vt. 113, 933 A.2d 706 (approving of trial court issuing additional instruction relating to available evidence); *State v. Keiser*, 174 Vt. 87, 92-94, 807 A.2d 378, 383-85 (2002) (affirming trial court's clarifying instruction on element of crime charged). This case, however, is one of first impression. While we have dealt with cases where a new charge was brought to the jury before deliberation, see *State v. Young*, 139 Vt. 535, 542-43, 433 A.2d 254, 258 (1981) (affirming conviction for attempted rape when defendant was charged only with rape and an attempt instruction was given before deliberation), we have yet to rule upon the propriety of responding to a question from the jury during deliberation by instructing the jurors on a new theory of liability. See generally *Cruz v. State*, 963 A.2d 1184 (Md. 2009) (reviewing cases involving supplemental instructions on lesser-included offenses).

¶ 25. At first glance, it is clear that instructing the jury on attempt — based on their apparent belief that "he is guilty of trying" — was an abuse of discretion and violated defendant's right to a fair trial. The jury's question to the judge was simple: "[Defendant] was not able to see her nipples. What kind of verdict do we give?" The judge had clearly instructed the jury on the elements of voyeurism, including the central requirement that defendant "intentionally viewed the intimate areas of another person," and had explained that the burden was on the State to prove each and every element of the crime beyond a reasonable doubt. The appropriate response to the jury's question, then, was to restate the elements and burden of proof instructions. Instead, the judge assisted the jury's expressed inclination to find defendant guilty of "trying" but failing, and provided them with an instruction on attempted voyeurism.

¶ 26. Other courts have observed that one of the chief dangers of instructing a jury on new charges during deliberation is that "the stalled jury may regard the newly furnished theory of liability as the court's recommendation to resolve the impasse." *United States v. Welbeck*, 145 F.3d 493, 497 (2d Cir. 1998). In *Rush v. State*, the court on appeal reversed the defendant's second-degree murder conviction, holding that the trial court's instruction to the jury on second-degree murder after they had deliberated for 28 hours and were unable to reach a verdict on first-degree murder — the charged offense — was prejudicial error. 395 S.W.2d 3, 8-9 (Ark. 1965). The state had requested no instruction on second-degree murder, and the defense counsel objected to the later instruction when it was given. The Arkansas Supreme Court held that the supplemental instruction on a lesser-included offense "had the effect of bargaining with the jury and . . . violated the rights of the defendant." *Id.* at 9. In *People v. Stouter*, the California Supreme Court found that the trial judge's decision to instruct the jury that they could "convict the defendant of the attempt was clearly an afterthought suggested by the statements of the jurors as to how *they then stood*, and apparently intended to help them, not generally to arrive at a verdict, but to arrive at some sort of a verdict of guilty." 75 P. 780, 781 (Cal. 1904) (emphasis added). The court wrote: "Such a proceeding is . . . a most dangerous interference with the right of a defendant to a fair trial." *Id.* In much the same vein, the appellate court in *State v. Jones* reversed the defendant's conviction for fourth-degree assault where the trial judge had offered it to the jury for the first time after an apparent deadlock. 518 A.2d 496 (N.J. Super. Ct. App. Div. 1986). The appellate court recognized that "charging a deadlocked or apparently deadlocked jury with a theretofore uncharged lesser-included offense is unduly and unfairly coercive." *Id.* at 499; see also *State v. Amos*, 553 S.W.2d 700, 703 (Mo. 1977) ("The jury might very well have considered the last instruction as an intimation of the desire of the court that the defendant be convicted of some offense.")[4] (quotations omit-

---

[4] The State points out that these cases involved stalled juries who had been deliberating for hours or even days. While I do not equate the jury's impasse in this case — which, again, pointed to a verdict of not guilty — with some of the longer deadlocked cases above, I believe the danger of undue influence is present whenever a judge responds to a jury's request for more options with an additional charge.

ted). As these cases recognize, even where the new charge is directly related to the initial charge, the potential for the jury to perceive a new instruction as a judge's preferred verdict is too great to be lightly put aside.

¶ 27. Beyond this potential influence and the fact that, as the majority makes clear, there was insufficient evidence to support any such attempt charge, defendant was harmed on a fundamental level when the trial court offered a new charge against him which altered the central theory of his defense and in effect denied him the right to respond to this new compromise charge. In making his closing argument, defendant essentially focused on one element of voyeurism, his inability to see the complainant's intimate areas through her second-story window from his position below in the parking lot. Counsel emphasized: "How is it that at five feet tall, standing in her shower, [defendant] could have looked up and seen the intimate areas of [the complainant]? And we're talking about her breasts here. How is that possible? Again, that's where you'll find reasonable doubt . . . . The question is, could he see her? And that's what the State needs to prove today." Not knowing the charge of attempted voyeurism would ever be before the jury, defendant never addressed the concept that he may have attempted to see her intimate areas.

¶ 28. This highlights another danger of giving a new instruction on an uncharged crime after the jury has begun deliberations: it deprives a defendant of the ability to adequately defend himself during the trial against the ultimate charge, and it denies him the ability to make a full and complete closing argument "on the evidence and the applicable law." *Herring v. New York*, 422 U.S. 853, 860 (1975) (quotation omitted). In *Herring*, the United States Supreme Court recognized:

> The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.

*Id.* at 862. When a criminal defendant is denied the opportunity to address a charge against him because it is provided to the jury

after the closing argument, this right is violated. His opportunity for a fair trial is virtually nil when, in reliance upon one set of instructions, he makes an argument conceding points that can prove his guilt under a later set of instructions. See *Welbeck*, 145 F.3d at 497 (noting that "prejudicial harm occurs where the defendant makes strategic concessions in summation which are damaging in relation to the later charged lesser included offense").

¶ 29. The State argues that defendant waived his opportunity to address the jury on the new charge by not requesting a supplemental closing argument. I express no opinion on whether that burden lies upon defendant, but observe that other courts have recognized that when such an opportunity is granted, it may not necessarily right the wrong of adding an additional charge after the closing argument. Compare *United States v. Horton*, 921 F.2d 540, 547 (4th Cir. 1990) (holding that "where a new theory is presented to the jury in a supplemental instruction after closing argument, the court generally should give counsel time for additional argument . . . [which] can cure any prejudice experienced as a result of supplemental instruction" and finding under facts of the case no prejudice because original charge and new charge were "so similar that the arguments to be made against guilt are essentially the same under both theories") with *Cruz*, 963 A.2d at 1192 ("We are not persuaded that a supplemental closing argument would have cured the problem created by the court's eleventh hour insertion of this new theory of culpability. Even in a supplemental closing argument, defense counsel could not eradicate her earlier concession . . . .").

¶ 30. Our Rules of Criminal Procedure are also instructive on this point. Rule 30 unequivocally states that the "court shall inform counsel of its proposed action upon the requests [for jury instruction] prior to their [closing] arguments to the jury." Multiple courts have held that when a judge alters or adds an additional instruction after closing argument, it violates the equivalent of Rule 30 and may require reversal. See, e.g., *People v. Millsap*, 724 N.E.2d 942, 948 (Ill. 2000) (reversing defendant's conviction where court instructed jury on attempt after closing arguments because "defendant was possibly convicted based upon a theory that he was never given a chance to address"); *Cruz*, 963 A.2d at 1195 (finding abuse of discretion when court gave "the jury a supplemental instruction on attempted battery during the jury's deliberations, because the court at the close of evidence

indicated that it would only instruct the jury on battery, the sole theory . . . elected by the State."); *People v. Clark*, 556 N.W.2d 820, 827 (Mich. 1996) ("The prejudice to the defendant in this case was incurred by virtue of defense counsel's argument in reliance on one instruction and the judge's subsequent decision to instruct the jury on a different one. This misled defense counsel in formulating his closing argument.").

¶ 31. From my perspective, there is little question that defendant's right to address the charges against him was violated in this case. Defendant's closing argument focused on the impossibility of defendant committing the offense from his vantage point and thus, even if he stood in the parking lot and looked at complainant's second-floor bathroom window, he knew he could not view complainant's intimate areas. The jury easily could have found this argument to be a concession that he intended to commit the crime but was "prevented in the execution" of the underlying offense — a central component in the attempt charge — by the height of the window. No additional argument could undo such concessions and, if anything, the closing only bolstered the charge of attempted voyeurism.

¶ 32. In responding to the jury's statement that defendant was not able to commit the charged crime but was "guilty of trying" by providing them with an instruction enabling them to find him "guilty of trying," the trial court exercised its discretion to an unreasonable extent. The compromise instruction effectively distorted defendant's closing argument into an expression of frustration and denied him the opportunity to address the novel charge against him. It upended his entire theory of the case, and he had virtually no ability to respond to it. This stands to reason as the instruction itself came out of the jury's own desire to convict defendant of something. But that is not the role the jury fills. Alongside the majority's holding on the insufficiency of the evidence, I would likewise reverse based on this violation of defendant's right to a fair trial.

¶ 33. I am authorized to state that Justice Johnson joins this concurrence.